**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| AUBREY VAUDO, Parent and Legal Guardian of R.W., a Minor, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:25-cv-13793-JEK |
| REVERE PUBLIC SCHOOLS and BUREAU OF SPECIAL EDUCATION APPEALS, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM AND ORDER ON PLAINTIFF'S**
**MOTION FOR A PRELIMINARY INJUNCTION**

**KOBICK, J.**

This case poses the following question: when a parent of a child with disabilities moves within a school district across residential zoning lines for schools, does the stay-put provision of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(j), require the school district to keep the child in her same school, even if the school zoned for her new residence can fully implement the child's agreed-upon educational program and provide materially identical supports and services? The answer is no. The Court will therefore deny the plaintiff's motion for a preliminary injunction, but it will order the parties to develop a collaborative transition plan for the child at issue in this case.

**BACKGROUND**

**I.      Statutory and Regulatory Framework.**

The IDEA provides states with federal funding in exchange for their commitment to furnish eligible children with disabilities a "free appropriate public education" ("FAPE"). 20 U.S.C.

§ 1412(a)(1)(A); *see A. J. T. by & through A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 339-40 (2025). A FAPE, as defined in the statute, consists of "'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158 (2017) (quoting 20 U.S.C. §§ 1401(9), (26), (29)). To ensure that the child's specific educational needs are met, the parents, teachers, and a representative of the local educational agency collaborate to design an individualized education program ("IEP"). 20 U.S.C. §§ 1401(14), 1414(d)(1)(B). An IEP consists of a "'written statement for each child with a disability that is developed, reviewed, and revised in accordance with' federal law and regulations." *G.D. by & through Jeffrey D. v. Swampscott Pub. Sch.*, 27 F.4th 1, 5 (1st Cir. 2022) (quoting 20 U.S.C. § 1414(d)(1)(A)(i)).

The IDEA envisions IEP development as a cooperative process, but the statute recognizes that disputes between parents and school districts may arise. *See Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 368 (1985). The statute thus incorporates extensive "procedural safeguards," set forth in 20 U.S.C. § 1415, that govern dispute resolution and aim to ensure that children with disabilities receive a FAPE. *See id.* at 368-69; *Doe v. Portland Pub. Sch.*, 30 F.4th 85, 90 (1st Cir. 2022). Parents, for example, "may challenge either the school system's handling of the IEP process or the substantive adequacy of the IEP itself by demanding an administrative due process hearing before a designated state educational agency." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 35 (1st Cir. 2012); *see* 20 U.S.C. § 1415(f). School districts, too, may request a due process hearing to challenge an existing IEP. *D.B.*, 675 F.3d at 35. The Bureau of Special Education Appeals ("BSEA") is the agency that conducts due process hearings for Massachusetts. *Doe v. Newton Pub. Sch.*, 48 F.4th 42, 48 (1st Cir. 2022). A

party dissatisfied with the BSEA's resolution of a dispute may appeal its final decision to state or federal court. 20 U.S.C. § 1415(i)(2)(A).

The IDEA's "stay-put" provision governs the educational placement of the child while administrative and judicial proceedings are ongoing. The provision specifies that, "during the pendency of any proceedings conducted pursuant to this section, . . . the child shall remain in [his or her] then-current educational placement," unless the parents and school district agree otherwise. 20 U.S.C. § 1415(j). The phrase "then-current educational placement" is not defined in the statute. *See A.W. ex rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 372 F.3d 674, 679 (4th Cir. 2004). "[D]esigned to guarantee a coherent educational experience for the disabled child until the conclusion of the review of the contested IEP," *Doe v. Brookline Sch. Comm.*, 722 F.2d 910, 915 (1st Cir. 1983), the stay-put provision aims to "ensur[e] that the student remains in the last placement that the parents and the educational authority agreed to be appropriate," *Portland Pub. Sch.*, 30 F.4th at 91 (quotation marks omitted).

## II.    Factual Background.

The following facts are drawn from the parties' evidentiary submissions and the BSEA decisions in this case.

R.W. is an 8-year-old child with autism who resides in Revere, Massachusetts and is eligible to receive special education services under the IDEA. ECF 1-5, ¶ 1. R.W. is currently enrolled at the A.C. Whelan Elementary School ("Whelan") in Revere, and she attends the IGNITE program for grades 2 through 4 at Whelan. *Id.* Before attending Whelan, R.W. was enrolled in the IGNITE program at Beachmont Elementary School ("Beachmont"), also in Revere. *Id.*

IGNITE is a specialized program that helps students develop academic, social, and behavioral skills, with suitable accommodations to support neurodiverse learning styles. *Id.* ¶ 2.

IGNITE classrooms are staffed by a teacher with a moderate special education license and two paraprofessionals. *Id.* ¶ 4. The classrooms have a maximum of twelve students and are supported by speech-language pathologists, occupational therapists, and board-certified behavior analysts. *Id.* IGNITE classrooms in Revere schools follow the same curriculum and deliver the same instruction. *Id.*; ECF 29-3, at 25:1-6, 26:5-7. Eligible students are assigned to IGNITE classrooms based on the school zoned for their residence. ECF 1-5, ¶ 4; ECF 29-3, at 25:7-10.

On November 26, 2024, plaintiff Aubrey Vaudo, mother of R.W., met with Revere Public School officials to develop an IEP for the period from November 26, 2024 until November 25, 2025. ECF 1-5, ¶ 5. That IEP recommended placement for R.W. "in the IGNITE program, a substantially separate classroom located at the Whelan Elementary School." ECF 27, at 41. It identified several challenges in R.W.'s English language arts, mathematics, speech and language, and visual processing, as well as her social, emotional, and behavioral skills, and it proposed direct services in the corresponding areas. *Id.* at 47, 49, 51-53, 63. While students with autism can exhibit "resistance to environmental changes or changes in daily routines," the IEP stated, R.W. did not have needs related to changes in her environment or daily routines. *Id.* at 42, 50. It also stated that R.W. requires door-to-door drop-off and pickup on a smaller vehicle, supervised by a monitor, to ensure her safety during the commute to and from school. *Id.* at 42, 65. Vaudo accepted the November 2024 IEP and placement in full. ECF 1-5, ¶ 5.

On September 10, 2025, at the start of R.W.'s third-grade year, Vaudo notified the School District that her family planned to move to a different residence in Revere on October 15, 2025. *Id.* ¶ 6. According to the District's zoning policy, Vaudo's new residence was in a different school zone and the move would therefore require R.W. to be reassigned to the IGNITE program at Beachmont. *Id.* ¶¶ 7, 15. In the Beachmont classroom, R.W. would be with the same teacher who

taught her when she previously attended Beachmont. *Id.* ¶ 7. It is undisputed that Beachmont can fully implement R.W.'s IEP, address all of R.W.'s IEP goals, and provide all of her services and accommodations. *Id.* ¶ 8; ECF 27, at 26 (Ex. B); ECF 29-3, at 31:2-14.

Revere Public Schools has a policy that allows students to remain in a school not zoned for their residence if the parent agrees to provide the child transportation to and from the school. ECF 1-5, ¶ 9. The parties dispute whether Vaudo agreed to transport R.W. to Whelan pursuant to this policy after the anticipated move. *Id.* ¶¶ 9, 13. But by October, Vaudo had concluded that, given her work schedule, she could not transport R.W. to and from Whelan. *Id.* ¶ 17. On October 7, 2025, she requested that R.W. remain at Whelan, with transportation provided by the District. *Id.* ¶ 10. Two days later, on October 9, Vaudo informed the District of an incident in March 2024, while R.W. was attending Beachmont, in which another child had a medical episode on the bus, hit R.W. repeatedly, and left R.W. with bruises on her face. *Id.* ¶ 11 & n.5; ECF 29-3, at 37-38. Vaudo objected to having R.W. return to Beachmont partly because of this bus incident. ECF 1-5, ¶ 11. However, the student who had the medical episode is currently in R.W.'s class at Whelan and rides on R.W.'s bus. *Id.* ¶ 22.

The next day, on October 10, the District denied Vaudo's request to have R.W. enrolled at Whelan if Vaudo could not provide transportation for R.W. to and from Whelan. *Id.* ¶ 12. Vaudo and R.W. moved to their new home in Revere on October 14. *Id.* ¶ 15.

About a week later, on October 20, the District proposed an amendment to R.W.'s November 2024 IEP, changing the location of services from Whelan to Beachmont, while maintaining R.W.'s assignment to the IGNITE program. *Id.* ¶ 17. Citing its residency review and neighborhood school zoning policy, the District rejected continuing services for R.W. at Whelan if Vaudo was unable to transport R.W. to Whelan herself. *Id.* When the District began to discuss

the transition plan for R.W. at Beachmont, Vaudo objected and expressed her intent to file a hearing request with the BSEA. *Id.* ¶ 18 & n.6; ECF 1-17, at 2.

In October and November 2025, after learning that she may move to a classroom at Beachmont, R.W. began experiencing episodes of anxiety and exhibiting concerning behaviors. ECF 1-14, at 1; ECF 29-3, at 40-41. These behaviors were described in letters Vaudo obtained from R.W.'s doctors. ECF 29-3, at 39-40. In the first letter, Dr. Janet Chua explained that "[c]hanging the environment can be very difficult and hard for patient[s] with an Autism diagnosis," and she recommended that R.W. "maintain and keep the same routine without any disturbances." ECF 27, at 36. In the second letter, Dr. Leonard Firer stated that R.W. has "shown increased anxiety and regression behaviors after overhearing discussion of a possible school change." *Id.* at 38. He reported that R.W. had "two episodes of encopresis and verbal expressions reflecting preoccupation with death, consistent with stress-related regression." *Id.* Dr. Firer advised that "[m]aintaining continuity in her current school setting is recommended to support emotional and development stability." *Id.*

Vaudo reports that R.W. is thriving at Whelan. ECF 1-5, ¶ 21; ECF 1-20, ¶ 4. She loves her teacher there, has friends, and enjoys going to school. ECF 1-5, ¶ 21; ECF 29-3, at 38:8-18. Vaudo is worried about changing R.W.'s classroom environment and disrupting R.W.'s routine, particularly because R.W. has been making progress on her IEP. ECF 1-5, ¶ 21; ECF 29-3, at 37-38. Even small transitions, Vaudo avers, can destabilize R.W., who has previously experienced anxiety, emotional shutdown, and physical symptoms during periods of transition. ECF 1-20, ¶¶ 5-6.

III.    **Procedural History.**

On October 23, 2025, the District filed a hearing request with the BSEA after notifying Vaudo. ECF 1-5, ¶ 19. The District's request raised two issues: 1) whether R.W.'s assigned school location constitutes her educational placement; and 2) whether Vaudo can invoke stay-put rights to her assigned school location. ECF 1-5, at 4. The following day, Vaudo filed her own hearing request with the BSEA, asserting that Whelan was R.W.'s stay-put placement and alleging that the District had violated the IDEA's substantive and procedural requirements. ECR 1-5, ¶ 19 n.7; ECF 1-6, at 2-3. Vaudo's hearing request was postponed until January 26, 2026 following a joint request of the parties. ECF 1-5, ¶ 19 n.7.

BSEA Hearing Officer Alina Kantor Nir conducted a virtual hearing on the District's hearing request on November 13, 2025. ECF 1-5, at 3, 13. Three witnesses testified: Sara Hoomis, Executive Director of Student Support at Revere Public Schools; Vaudo, R.W.'s mother; and Cody Edmunds, R.W.'s father. *See generally* ECF 29-3. At the hearing, the parties disputed whether R.W.'s anticipated move to Beachmont triggered the IDEA's stay-put provision. That question turned on whether R.W.'s "then-current educational placement" was an IGNITE classroom, as the District contended, or was the IGNITE classroom at the Whelan School, as Vaudo contended. If Vaudo was correct that R.W.'s educational placement was the IGNITE classroom at Whelan, then moving R.W. to the IGNITE classroom at Beachmont would constitute a change in her placement, and R.W. would be entitled to remain at Whelan, with transportation provided by the District, pending a hearing on that proposed change. The District agreed to continue providing transportation for R.W. to Whelan pending the BSEA's decision. ECF 1-5, ¶ 14; ECF 29-5, ¶ 7.

On December 8, 2025, the BSEA Hearing Officer issued a decision agreeing with the School District's position. ECF 1-5. The Hearing Officer concluded that the IDEA's stay-put

provision did not entitle R.W. to remain at Whelan because R.W.'s educational placement was the IGNITE program, not the IGNITE program at Whelan specifically. *Id.* at 10-13. The School District had not proposed a change in R.W.'s educational placement, the Hearing Officer reasoned, because Beachmont could fully implement R.W.'s IEP and the move to Beachmont pursuant to the District's zoning policy made no significant change to R.W.'s educational programming. *Id.* at 11-12. While acknowledging Vaudo's concerns about R.W.'s transition to Beachmont, the Hearing Officer explained that the IDEA does not afford students a right to remain with individual teachers or peers, and the District had developed an appropriate transition plan for R.W. *Id.* at 13.

Later that day, Vaudo filed a motion for interim relief seeking to keep R.W. enrolled at Whelan. ECF 1-6, at 2. The District opposed the motion and moved to dismiss Vaudo's hearing request on the grounds that it had been mooted by the BSEA's decision. *Id.* The next day, December 9, the BSEA Hearing Officer denied Vaudo's motion for interim relief and granted the District's motion to dismiss Vaudo's hearing request. *Id.* at 6-8. The District initiated a transition plan to have R.W. begin at Beachmont on December 15. ECF 27, at 75.

On December 10, 2025, Vaudo, proceeding *pro se*, filed a lawsuit and a motion for a temporary restraining order in this Court against Revere Public Schools. ECF 1, 3. The School District opposed the motion the following day. ECF 14. Two days later, after holding a hearing, the Court granted Vaudo's motion and issued a temporary restraining order prohibiting Revere from transferring R.W. to Beachmont, and requiring Revere to continue providing R.W. with transportation to Whelan, pending resolution of Vaudo's forthcoming motion for a preliminary injunction. ECF 16, 17. The Court did not address Vaudo's likelihood of success on the merits of her claims; instead, the temporary restraining order issued in order to preserve the status quo and avoid the irreparable harm R.W. would likely experience from transferring to a new school on

8

short notice. ECF 17, at 2. The Court also set a briefing schedule for Vaudo's preliminary injunction motion. *Id.* at 2-3.

In late December, Vaudo filed an amended complaint that named Revere Public Schools and the BSEA as defendants. ECF 23. The amended complaint asserts an IDEA claim seeking review of the BSEA's December 8 and December 9, 2025 decisions (Count 1); an IDEA claim alleging violations of the IDEA's procedural safeguards (Count 2); a claim for declaratory relief (Count 3); and a claim asserting that the BSEA's dismissal of Vaudo's hearing request was arbitrary and capricious and contrary to law (Count 4). ECF 23, at 3. Vaudo also filed a motion for preliminary injunction pursuant to Federal Rule of Civil Procedure 65. ECF 26. Seeking an order that would convert the temporary restraining order into a preliminary injunction, her motion contends that she is likely to succeed on the merits of Count 1, concerning her challenge to the BSEA Hearing Officer's stay-put decision of December 8, 2025. ECF 26, ¶ 5; ECF 27, at 4-6. After receiving opposition briefs from Revere and the BSEA, as well as a reply brief from Vaudo, the Court held a hearing on the motion and took it under advisement. ECF 29, 30, 31, 32.

## STANDARD OF REVIEW

"'A preliminary injunction is an extraordinary and drastic remedy . . . that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quotation marks and citations omitted). To secure a preliminary injunction, the plaintiff bears the burden to demonstrate: "'(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). The first "factor weighs most heavily in the preliminary

injunction analysis," *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020), and is considered "'the main bearing wall of the four-factor framework,'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)). The Court liberally construes Vaudo's submissions because she is proceeding *pro se*. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## DISCUSSION

The parties dispute whether the stay-put provision of the IDEA requires Revere Public Schools to keep R.W. at the Whelan School, and to keep providing her transportation to and from Whelan, pending a further hearing before the BSEA, even though R.W. now lives in a home zoned for the Beachmont School. That question turns on whether R.W.'s current educational placement in her IEP is the IGNITE program, as Revere contends, or the IGNITE program at Whelan, as Vaudo contends. The Court concludes that, in the circumstances of this case—where R.W.'s parents took unilateral action to move her outside the Whelan school zone in Revere, and where the educational programming at Beachmont is materially indistinguishable from the educational programming at Whelan—the stay-put provision does not entitle R.W. to remain at Whelan pending resolution of the dispute over her placement. Balancing the equitable factors, Vaudo's motion will be denied because she is not likely to succeed on the merits of her IDEA claim challenging the BSEA's stay-put decision, because the balance of the equities and public interest favor Revere, and because the harm R.W. might experience in moving from Whelan to Beachmont can be alleviated by an order requiring the parties to engage in collaborative transition planning.

## I.    Likelihood of Success on the Merits.

When a school district proposes to change the educational placement in a child's IEP, the IDEA's stay-put provision directs that, absent agreement otherwise, the child shall remain in her

"then-current educational placement" during the pendency of any administrative or judicial proceedings. 20 U.S.C. § 1415(j). The provision "ensures that the student remains in the last placement that the parents and the educational authority agreed to be appropriate." *Verhoeven v. Brunswick Sch. Comm.*, 207 F.3d 1, 10 (1st Cir. 1999).

The parties here dispute what R.W.'s "current educational placement" is: Revere understands it to encompass R.W.'s educational programming in the IGNITE program, while Vaudo understands it to encompass IGNITE's educational programming as well as the physical location at the Whelan School. The text of the stay-put provision, which does not define the phrase "current educational placement," offers little guidance as to whether, and to what extent, Congress intended an educational placement to incorporate the physical location of a school. *See A.W.*, 372 F.3d at 679 (the phrase "current educational placement" is an undefined "term of art"). And the minimal legislative history suggests only that Congress intended for the provision to be construed flexibly to meet the needs of the student and school district. *See Brookline Sch. Comm.*, 722 F.2d at 918 (discussing the statement of Senator Stafford, a sponsor of the IDEA's predecessor statute, that in considering changes of placement, "the conference adopted a flexible approach to try to meet the needs of both the child and the State" (quoting 121 Cong. Rec. 37412 (Nov. 19, 1975))).

Absent meaningful guidance from the statute's text or legislative history, the Court looks to Congress's purposes in enacting the stay-put provision. In discussing precursor versions of the current stay-put provision, the Supreme Court explained that Congress sought to "prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceeding." *Town of Burlington*, 471 U.S. at 373. The Court thought it "clear" that Congress "meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed

students, from school." *Honig v. Doe*, 484 U.S. 305, 323 (1988) (emphasis in original). At the same time, the Court recognized that the stay-put provision does not displace "normal [school] procedures," nor was it intended to "leave educators hamstrung"; rather, the provision supports the IDEA's overriding objective to guarantee every child a FAPE. *Id.* at 325; *see A.W.*, 372 F.3d at 680-81. Elaborating on these objectives, the First Circuit has noted Congress's aim through the stay-put provision "'to protect children from any retaliatory action or from any disciplinary action not commensurate with the educators' need to protect the pupils in its system.'" *Brookline Sch. Comm.*, 722 F.2d at 918 n.8 (quoting *Cox v. Brown*, 498 F. Supp. 823, 828-29 (D.D.C. 1980)).[1]

Looking to these objectives of the stay-put provision, several courts of appeals have considered the meaning of the phrase "current educational placement" in analogous cases. Most hold that the phrase refers to the general type of educational program specified in the child's IEP but does not also include the right to remain in a particular school or keep a particular teacher pending administrative and judicial proceedings. According to the Second Circuit, the stay-put provision "guarantees only the same general level and type of services that the disabled child was

---

[1] The First Circuit has also repeatedly said that the stay-put provision establishes a strong preference for maintenance of the status quo in a child's education. *See Portland Pub. Sch.*, 30 F.4th at 91; *Brookline Sch. Comm.*, 722 F.2d at 915, 918. That statutory aim provides little guidance in this case, however, because the parties' understanding of the status quo differs. In Revere's view, the status quo is R.W.'s placement in the IGNITE program in the school zoned for her current residence. In Vaudo's view, the status quo is R.W.'s placement in the IGNITE program at Whelan, regardless of the school district's zoning policy. Because the dispute boils down to determining how the IDEA's stay-put provision conceives of the status quo in the circumstances of this case, the Court does not rely on that statutory purpose as a significant guidepost. For similar reasons, the Court's determination of R.W.'s current educational placement under the stay-put provision does not turn on which party bears the burden of proof. Under First Circuit precedent, the party seeking to modify the status quo in a child's educational placement bears the burden of proof on a motion for a preliminary injunction concerning the stay-put provision. *See Brookline Sch. Comm.*, 722 F.2d at 919. But where, as here, the entire dispute is over what constitutes the status quo, the inquiry is circular and assignment of the burden of proof does not aid in the endeavor.

receiving," but does not afford "the right to remain in the exact same school with the exact same service providers." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 171 (2d Cir. 2014). In the Fourth Circuit, too, "the touchstone of the term 'educational placement'" in the stay-put provision "is not the location to which the student is assigned but rather the environment in which educational services are provided." *A.W.*, 372 F.3d at 682. Thus, when a new setting "replicates the educational program contemplated by the student's original assignment" and "afford[s] access to a FAPE," the transfer of a student between "materially identical settings does not implicate the 'stay-put' provision." *Id.* at 682-83. The Ninth and Tenth Circuits appear to agree. *See N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1116 (9th Cir. 2010) (the phrase "'educational placement' means the general educational program of the student"); *Johnson ex rel. Johnson v. Special Educ. Hearing Off., State of Cal.*, 287 F.3d 1176, 1181 (9th Cir. 2002) (rejecting the argument that the stay-put provision entitled a child with autism to retain the "exact same" treatment providers, so long as the new providers could provide a "comparable educational placement"); *Erickson v. Albuquerque Pub. Schs.*, 199 F.3d 1116, 1122 (10th Cir. 1999) ("An educational placement is changed when a fundamental change in, or elimination of, a basic element of the educational program has occurred.").

The Seventh Circuit takes a different tack, concluding that "the meaning of 'educational placement' falls somewhere between the physical school attended by a child and the abstract goals of a child's IEP." *Bd. of Educ. of Community High School Dist. No. 218, Cook Cnty., Ill. v. Ill. State Bd of Educ.*, 103 F.3d 545, 548 (7th Cir. 1996). In light of the purposes animating the stay-put provision, that court views a change of school as a change in placement when a school seeks to expel a child for behavioral or disability-related reasons. *Id.* at 548-49. But where a child is moved from one school to another due to "external factors," like fiscal concerns, the stay-put

provision's focus is "not on the school, but on the child's general education program." *Id.* In the latter context, the Seventh Circuit explained, "the concern is not whether the school is attempting to rid itself of a disabled child or that a disabled student has been placed in an inappropriate school." *Id.* at 549. The Third and Eighth Circuits appear to have embraced the Seventh Circuit's reasoning. *See D.M. v. N.J. Dep't of Educ.*, 801 F.3d 205, 215-18 (3d Cir. 2015); *Hale ex rel. Hale v. Poplar Bluffs R-I Sch. Dist.*, 280 F.3d 831, 834 (8th Cir. 2002) (per curiam).

The First Circuit has not construed the term "current educational placement" in a case, like this, that spotlights the distinction between a child's educational program and school location for purposes of the stay-put provision. But Vaudo has not advanced, nor does this Court discern, any convincing rationale for departing from the persuasive reasoning of the other courts of appeals. Under any of those courts' interpretations of "current educational placement," R.W.'s educational placement is the IGNITE program, not the IGNITE classroom at Whelan. It is undisputed that the IGNITE classrooms at Whelan and Beachmont provide R.W. with materially identical educational programming and services, and that both IGNITE classrooms can fully implement her IEP. And Vaudo does not contend that R.W. will not receive a FAPE in the IGNITE classroom at Beachmont. Under the construction of "current educational placement" adopted by the Second, Fourth, Ninth, and Tenth Circuits, the substantive equivalency between the educational offerings at Whelan and Beachmont compels the conclusion that the stay-put provision is no barrier to reassigning R.W. to the IGNITE classroom at Beachmont. The same conclusion obtains under the Third, Seventh, and Eighth Circuits' construction of "educational placement," because Revere is not attempting to expel R.W. from Whelan due to her behavior or disability. Instead, it is relocating R.W. due to an external factor—its school zoning policy—that applies to all children in the district and dictates, among other things, school busing routes.

14

The purposes of the stay-put provision fortify the conclusion that moving R.W. to Beachmont does not trigger the stay-put provision. In enacting that provision, Congress wished to prevent school districts from taking unilateral action to exclude children with disabilities from their classrooms over their parents' objection. *See Honig*, 484 U.S. at 323; *Town of Burlington*, 471 U.S. at 373. But here, the event that triggered R.W.'s move to Beachmont was her parents' decision to move across school zoning lines in the middle of the school year. This is not a case in which the school district took unilateral action to remove R.W. from Whelan; rather, R.W.'s parents initiated the chain of events that gave rise to this dispute by moving residences. *See J.F. v. Byram Twp. Bd. of Educ.*, 629 Fed. App'x 235, 237 (3d Cir. 2015) (the "purpose of the stay-put provision, which is to maintain the status quo in situations where the *school district* acts unilaterally, is not implicated" when a parent "unilaterally relocate[s]" a child from one district to another (emphasis in original)). Under Revere's zoning law, children are zoned for particular schools and bus routes are developed based on those maps. Upon learning about R.W.'s move, Revere applied its generally applicable school zoning policy to a child whose new classroom would be fully able to implement the programs and services specified in her IEP. In so doing, it did not alter R.W.'s educational placement. *See N.D.*, 600 F.3d at 1117 ("The IDEA did not intend to strip administrative powers away from local school boards and give them to parents of individual children.").

For these reasons, the BSEA Hearing Officer correctly concluded that R.W.'s "current educational placement" is the IGNITE program, not the IGNITE classroom at Whelan. The IDEA's stay-put provision does not apply here, because there will be no meaningful change in the education and services R.W. receives at Beachmont. Vaudo has therefore not met her burden to

demonstrate a likelihood of success on the merits of her IDEA claim challenging the BSEA's stay-put decision.

## II.    **Irreparable Harm, the Balance of the Equities, and the Public Interest.**

Turning to the remaining equitable factors, the parties dispute whether R.W. will likely experience irreparable harm if she moves to Beachmont before the conclusion of the administrative and judicial proceedings. Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).

In support of her assertion that R.W. will experience harm absent a preliminary injunction, Vaudo has submitted two doctors' notes and her own affidavit. The first letter, authored by Dr. Chua, states that it would be "beneficial" for R.W. to remain at Whelan because "[c]hanging the environment can be very difficult and hard for patient[s] with an Autism diagnosis." ECF 27, at 36. The second letter, written by Dr. Firer, reports that, after learning of a possible change in schools, R.W. exhibited "increased anxiety and regression behaviors," including "two episodes of encopresis and verbal expressions reflecting preoccupation with death, consistent with stress-related regression." *Id.* at 38. Dr. Firer recommended "[m]aintaining continuity in [R.W.'s] current school setting." *Id.* Vaudo's affidavit further attests that small transitions can destabilize R.W. and cause anxiety, emotional shutdown, and physical symptoms. ECF 1-20, ¶¶ 5-6.

When the Court entered the temporary restraining order in December 2025, it cited these same submissions in concluding that R.W. may experience irreparable harm without immediate relief. But there are two significant differences between the posture of the case at that point and the posture of the case now. First, when the Court considered Vaudo's motion for a temporary

restraining order, Revere was planning to transfer R.W. to Beachmont on December 15, 2025, a mere week after the BSEA Hearing Officer's decision. The Court concluded that moving a child with R.W.'s needs to a new classroom, with scant time to prepare her for the transition and right before the winter holidays, would likely prove harmful to R.W. ECF 17, at 2. Now, however, Revere makes a different request. It asks the Court to order, in the event Vaudo's preliminary injunction motion is denied, that the parties engage in mutual, good faith transition planning for R.W.'s reassignment to Beachmont within "a few weeks" of the Court's order. ECF 29-1, at 14. This request recognizes that, for R.W., transitioning immediately to a new school may inflict some harm, but that good faith planning from all stakeholders can mitigate the difficulties R.W. may experience.

Second, the Court explained to the parties that, in view of the urgency of Vaudo's request for relief, it was not considering her likelihood of success on the merits when it entered the temporary restraining order in December. But irreparable harm is generally measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). The Court has now concluded that Vaudo is unlikely to succeed on the merits of her claim challenging the BSEA Hearing Officer's December 8, 2025 stay-put decision. Thus, the potential harm to R.W. that the Court recognized in December must now be weighed against Revere's likelihood of success on the merits and, as will be discussed, the other equitable factors favoring Revere. That harm—lessened by the time Vaudo has had since December to discuss the possible change in schools with R.W., and by Revere's well taken request for an order requiring collaborative transition planning—does not by itself compel granting Vaudo's preliminary injunction motion.

The third factor—the balance of the hardships—favors Revere. On the one hand, as discussed, R.W. will likely experience some hardship if she moves from Whelan to Beachmont. But the move is not inevitable. Throughout the proceedings, Revere has provided Vaudo the option of keeping R.W. at Whelan if Vaudo can provide R.W. transportation to and from that school. ECF 29-7, ¶ 2. Revere reiterated that option at the hearing on Vaudo's preliminary injunction motion. On the other hand, keeping R.W. at Whelan for the duration of the proceedings inflicts real costs on Revere. Revere voluntarily agreed to assume the cost of R.W.'s transportation to and from Whelan pending the BSEA Hearing Officer's decision, even though that expense was not required by the IDEA. The Superintendent of Revere Public Schools attests that if Revere were required to fund R.W.'s busing to and from Whelan for the remainder of this school year, it would cost the district at least $19,750. *Id.* ¶ 6. That is a substantial, and unbudgeted, sum for the district, which must fund transportation and education for all students in Revere. In contrast, because R.W.'s new residence places her on the existing bus route to and from Beachmont, Revere would incur no additional cost if R.W. attends Beachmont. *Id.* ¶ 7. And at Beachmont, R.W. would, as at Whelan, retain all the same services, supports, and programming required by her IEP.

The public interest also favors Revere. School districts like Revere have an important governmental interest in the development and implementation of school zoning policies. Such policies allow municipalities to engage in long-term planning, allocate appropriate funding for each school within the district, and allocate appropriate funding for transportation routes. Revere also has a policy that allows exceptions to its school zoning policy, so long as a parent can provide transportation for her child. In this case, Vaudo is seeking an exemption from both policies so that her daughter can remain at her present school location, with transportation funded by the District. In a case where the educational programming between schools is materially different, such an

exception may be warranted, or indeed compelled, by the IDEA. But here, Vaudo has never disputed that R.W. would retain access at Beachmont to all the services specified in her IEP and that Beachmont can fully implement her IEP. Vaudo has expressed a preference for the teacher in the IGNITE classroom at Whelan, and she is understandably concerned about maintaining stability for R.W. But allowing parents to demand exemptions from generally applicable zoning policies, based on teacher preference or otherwise, when such an exemption is not required by the IDEA, is not in the public interest.

In sum, the balance of the equitable factors requires denial of the motion for a preliminary injunction. Vaudo has not demonstrated a likelihood of success on the merits of her IDEA claim, and the public interest and the balance of the hardships favor Revere. While R.W. may experience some difficulties in her transition to a new school, that hardship can be ameliorated by an order requiring the parties to work together, in good faith, on a transition plan for R.W.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, Vaudo's motion for a preliminary injunction, ECF 26, is DENIED. The temporary restraining order entered on December 12, 2025, ECF 17, is hereby VACATED. Revere is ORDERED to delay transferring R.W. to the Beachmont Elementary School until March 23, 2026. During the period between the date of this Order and March 23, the parties are ORDERED to engage in mutual, good faith transition planning for R.W. ahead of any move to the IGNITE classroom at Beachmont.

SO ORDERED.

/s/ Julia E. Kobick_____
JULIA E. KOBICK
Dated: March 5, 2026            UNITED STATES DISTRICT JUDGE